IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
May 7, 2024 Session

## WESTPORT INSURANCE CORPORATION ET AL. v. HOWARD TATE SOWELL WILSON LEATHERS & JOHNSON, PLCC ET AL.

**Appeal from the Circuit Court for Davidson County**
**No. 20C797   Don R. Ash, Senior Judge**

_____

**No. M2023-01168-COA-R3-CV**

_____

Plaintiff insurance company is the insurance carrier for an insurance agency that was sued for negligence in five Tennessee lawsuits. After the underlying lawsuits were settled, the plaintiff, in its own name and on behalf of its insured, sued the law firm that represented the insured in the lawsuits. The plaintiff asserted a direct legal malpractice claim, a legal malpractice claim as subrogee of the insured, and a negligent misrepresentation claim. The trial court dismissed all claims. In particular, the trial court ruled that the plaintiff could not maintain a direct legal malpractice claim against the law firm due to the lack of attorney-client relationship and that the assignment of legal malpractice claims is prohibited in Tennessee. In the alternative, the trial court ruled that the plaintiff could not establish the damages element of its legal malpractice claims. The trial court further ruled that the plaintiff failed to establish a misrepresentation of existing or past fact. We affirm the trial court's dismissal of the plaintiff's direct legal malpractice action. As to the remainder of the trial court's rulings, however, we reverse.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed in Part; Reversed in Part; and Remanded**

J. STEVEN STAFFORD, P.J., W.S., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and ANDY D. BENNETT, J., joined.

David Randolph Smith and Dominick R. Smith, Nashville, Tennessee, and Michael C. Bruck and Timothy J. McInerney, Chicago Illinois, for the appellants, Westport Insurance Corporation, and Brands Insurance Agency, Inc.

Lauren Paxton Roberts and Ashley Goins Alderson, Nashville, Tennessee, for the appellee, Howard, Tate, Sowell, Wilson, Leathers & Johnson, PLLC.

# OPINION

## I. FACTUAL AND PROCEDURAL HISTORY

In late June 2015, Benjamin Brewer was driving a truck owned and operated by his employer Cool Runnings Express, Inc. ("Cool Runnings"). Mr. Brewer was traveling from Kentucky, where Cool Runnings is based, to Florida and back. On the return trip, Mr. Brewer had a collision in a construction zone near Chattanooga, Tennessee. The crash resulted in numerous injuries and six deaths.

As a result of the crash, five lawsuits were filed in Hamilton County Circuit Court ("the Hamilton County court"): (1) *Humphries v. Brewer, et. al*, case no. 15C875; (2) *Estate of Garrigues v. Marten Transport, Ltd., et. al*, case no. 16C761; (3) *Estate of Watts and Estate of Anderson v. Marten Transport, Ltd., et. al.*, case no. 16C762; (4) *Estate of Ramos v. Marten Transport, et. al.*, case no. 16C765; and (5) *Estate of Gallaher v. Brewer*, et. al., case no. 16C1053 (collectively, "the Underlying Lawsuits"). In the course of the Underlying Lawsuits, some defendants identified Brands Insurance Agency ("Brands") as a potential tortfeasor for having allegedly conducted a deficient driving history check on Mr. Brewer that led to his hiring as a truck driver with Cool Runnings. Brands was then added as a defendant in amended pleadings in the Underlying Lawsuits.

The allegations against Brands stated that Brands had been hired by Cool Runnings to obtain a driver history report on Mr. Brewer. On June 16, 2015, Brands obtained from its Ohio office a copy of Mr. Brewer's three-year driver history report from Kentucky, which revealed no disqualifying information. As a result, on June 17, 2015, Brands sent a letter from its Ohio office to Cool Runnings' Kentucky office, stating that Mr. Brewer had been approved to be covered as a driver under Cool Runnings' insurance policy[1]. Cool Runnings thereafter instructed Brands to add Mr. Brewer to its insurance policy.

If Brands had run a five-year driver history report, however, Mr. Brewer's accident history would have been revealed.[2] But to obtain a five-year report, Brands needed a notarized authorization from Mr. Brewer. Mr. Brewer had provided a signed authorization, but the authorization was not notarized.

Brands maintained professional liability insurance through Plaintiff/Appellee Westport Insurance Corporation ("Westport"). The policy gave Westport the right and duty to defend, investigate, and settle all claims against Brands. Moreover, the policy stated that Brands was required to "cooperate with us in providing information and documentation

---

[1] This refers to a different policy than the liability policy provided by Westport. Instead, the insurance policy to which Mr. Brewer was approved was provided by Lancer Insurance Company, an Illinois corporation.

[2] Three-year reports do not include information about prior accidents.

- 2 -

requested by us regarding any CLAIM or POTENTIAL CLAIM reported under the POLICY[.]" The Westport policy also contained an express subrogation clause stating that if Westport "pay[s] any damages or claim expense, [Westport] shall be subrogated to the rights of the insured against any person or organization" and that Brands would do whatever was necessary to allow Westport to "bring SUIT in the name of the INSURED."

On or about June 13, 2017, Westport retained law firm Defendant/Appellee Howard Tate Sowell Wilson Leathers & Johnson, PLLC ("Howard Tate") and specifically its attorney Nathan Cherry, to defend Brands in each of the Underlying Lawsuits. Howard Tate served as one of Westport's "panel counsel" of firms that agreed to regularly defend Westport's insureds. Howard Tate directed its invoices to Westport, which Westport paid.

Mr. Cherry had performed work for Westport previously and had agreed to abide by Westport's Litigation Guidelines ("the Guidelines"). The Guidelines provided the following with regard to confidentiality:

> In order to facilitate the common interests of the Company and the Insured in the defense of a particular case, it is imperative that there be a free flow of information between [Westport], Insured and Defense Counsel. Including, but not limited to, confidential and proprietary information of Insured and [Westport]. It is expected that Defense Counsel shall take reasonable precautions to insure that Insured or [Westport] proprietary information, the information shared within the tripartite relationship, and information shared by the parties, including without limitation, attorney-client communications and the mental impressions and work product of Defense Counsel, remain privileged and/or confidential. This information should not be shared with anyone other than [Westport], Insured, Defense Counsel and their respective employees and agents who are reasonably necessary to the defense and/or administration of [Westport's] and Insured's common interests.

To that end, retained counsel was "expected [to] keep the Company [i.e., Westport] and the Insured fully informed of the progress of all litigated cases, and [to] forward timely and complete reports on each case assigned." The Guidelines also provided that defense counsel agreed to "consult with [Westport] before drafting or filing any dispositive motions" and noted that it was "imperative that there be continued communication (both written and verbal) by Defense Counsel with [Westport] throughout the case[.]" The Guidelines described representation undertaken for Westport as "a collaborative process between [Westport], Defense Counsel and the Insured."

In June 2017, the question of personal jurisdiction over Brands in the Underlying Lawsuits was posed by Mr. Cherry to his associate, Michelle Reid. Ms. Reid found a case holding that a court could not exercise personal jurisdiction over an out-of-state insurance

provider and saved the case to the Brands file, but Mr. Cherry never discussed the research with Ms. Reid because he learned that certain assumptions about Brands' business dealings in Tennessee were inaccurate and that, as a result, the line of research based on those inaccurate hypothetical facts was not on point.[3]

On June 29, 2017, Mr. Cherry traveled to Cincinnati, Ohio, to meet with Brands at its office. Mr. Cherry noted the following contacts with Tennessee: "18 agents / all doing same work / have a TN non-resident license/ has TN customers 50-100 / about 40 states operate in - no advertising at all / all word of mouth[.]" Nevertheless, Mr. Cherry concluded that personal jurisdiction was not a viable defense for Brands in the Underlying Lawsuits. Mr. Cherry never discussed the possibility of a lack of personal jurisdiction defense with Westport. Instead, on July 5, 2017, Mr. Cherry recommended to Westport that Brands should take the same position as another defendant, arguing that Brands did not owe a legal duty to the plaintiffs in the Underlying Lawsuits. Mr. Cherry thereafter filed motions to dismiss the Underlying Lawsuits on this theory.

Pursuant to the Guidelines, on October 17, 2017, Mr. Cherry sent an "Attorney Suit Report," to Brian Butcher, Westport's Claim Handler for this matter. The Attorney Suit Report was designated as "attorney-client privileged material, prepared by counsel at the request of the Westport claims department." The Attorney Suit Report discussed the facts, liability assessment, damages, discovery, motion practice, venue, and resolution strategy, and a proposed litigation plan and budget. The Attorney Suit Report noted that motions to dismiss for failure to state a claim due to lack of duty had been filed, which motions had a 25%–35% chance of success. If those motions were denied, however, the Attorney Suit Report noted that Mr. Cherry would next file motions for summary judgment.

Although Mr. Cherry advised that it was his position that Brands did not breach the standard of care, Mr. Cherry nevertheless recommended that the case "likely need[ed] to be settled." Mr. Cherry explained, "if the matter makes it to trial and the jury decides otherwise, even a small percentage of comparative fault is very likely to result in potential excess exposure [greater than $5 million] to the client, which should be avoided if possible." (Alteration in original).

The Attorney Suit Report did not discuss personal jurisdiction in any manner. According to Mr. Butcher, it was standard practice for counsel retained by Westport to advise it of any defenses that had been researched and considered, including counsel's opinions as to whether they were viable. Mr. Butcher noted, however, that lack of personal jurisdiction was not a default defense that was raised in all of Westport's legal matters.

Brands' motions to dismiss based on lack of duty were ultimately not successful. After the motions to dismiss were denied, Mr. Cherry filed answers on behalf of Brands in

---

[3] The specific case at issue was authored by the Ninth Circuit Court of Appeals.

- 4 -

the Underlying Lawsuits. The answers stated the defense of lack of personal jurisdiction, which Mr. Cherry later described in a deposition as merely a "throw in" because personal jurisdiction had been waived by this point in his opinion.

In April 2018, Brands hired additional counsel with Frost Brown & Todd ("Frost Brown"). Frost Brown identified the personal jurisdiction issue and discussed it with Mr. Cherry, but Mr. Cherry concluded that the defense had been waived at that point. So in June 2018, Mr. Cherry informed Westport and Brands of a conflict of interest due to the potential waiver. Howard Tate thereafter withdrew from the representation and was terminated by Westport.

In July 2018, Frost Brown filed renewed motions to dismiss based on lack of personal jurisdiction in the Underlying Lawsuits; the motions were eventually denied solely on the basis of waiver. Thereafter, the Underlying Lawsuits were settled for confidential sums after a two-day global mediation.

On April 6, 2020, Westport, individually, and as subrogee of Brands, filed a complaint against Howard Tate in Davidson County Circuit Court ("the trial court").[4] The complaint raised four "counts": (1) a negligent misrepresentation claim; (2) a direct legal malpractice claim by Westport individually; (3) a legal malpractice claim by Westport as the contractual subrogee of Brands; and (4) a legal malpractice claim by Westport as the equitable subrogee of Brands.[5] The complaint alleged that Howard Tate failed to properly investigate, identify, and raise a personal jurisdiction defense in the Underlying Lawsuits and that Westport was required to pay substantial sums due to Howard Tate's negligence. Specifically, Westport alleged that had personal jurisdiction been timely raised in the Underlying Lawsuits, Brands would have been dismissed as a defendant and Westport would not have paid any damages. Westport also alleged that Howard Tate was guilty of negligent misrepresentation because it supplied Westport with faulty information meant to guide Westport's litigation decisions.

Westport and Howard Tate filed cross-motions for summary judgment on May 1, 2023, and May 2, 2023, respectively. Westport's motion sought partial summary judgment only as to "whether a reasonable judge would have dismissed Brands from the Underlying Suits for lack of personal jurisdiction if the issue was timely and properly raised."

Howard Tate argued, however, that the entire case should be dismissed, citing inter alia, that Westport lacked standing to file a legal malpractice action because actions of that type are not assignable, that Howard Tate did not breach its duty of care, and that Westport

---

[4] Mr. Cherry was also named as a party in the complaint but was immediately voluntarily dismissed without prejudice.
[5] Westport stated that its equitable subrogation claim was an alternative to its contractual subrogation claim.

cannot show that a motion to dismiss for lack of personal jurisdiction would have been successful in the Underlying Lawsuits. Howard Tate also argued that the misrepresentation claim should fail because Westport failed to identify a misrepresentation of past or present facts to Westport.

Oral argument on the cross-motions took place on June 20, 2023. The trial court issued a written order on July 14, 2023, denying Westport's motion for partial summary judgment and granting Howard Tate's motion for summary judgment and dismissal. Although the trial court ruled that disputed issues of material fact prevented summary judgment on the issues of breach of the standard of care and proximate cause, the trial court ruled that (1) Westport lacked standing to pursue a legal malpractice claim against Howard Tate; (2) Westport failed to carry its burden to demonstrate that a reasonable judge would have granted motions to dismiss for lack of personal jurisdiction in the Underlying Lawsuits; and (3) Westport failed to identify any past or present facts that Howard Tate misrepresented. Westport thereafter appealed to this Court.

## II. ISSUES PRESENTED

Westport raises the following issues for our review, which are taken from its appellate brief:

1. Whether an insurer, Westport, has standing, either directly or through contractual or equitable subrogation, to maintain a legal malpractice action against its panel counsel, Howard Tate, hired by Westport to defend its insured (Brands) and upon which Westport relied.
2. Whether, as a matter of law, a reasonable judge in the underlying suits would have granted a timely and proper motion to dismiss Brands for lack of personal jurisdiction, where Brands was "at home" in Ohio, had limited contacts with Tennessee, and the underlying suits did not arise from or relate to Brands' Tennessee contacts.
3. Whether Howard Tate's failure to fully investigate the lack of personal jurisdiction defense, its failure to disclose the defense to Westport, its waiver of the defense, and its recommendation to Westport to move for dismissal on another ground, upon which Westport relied, constitutes the supply of faulty information sufficient for a negligent misrepresentation claim.

## III. STANDARD OF REVIEW

We review the trial court's grant of summary judgment de novo, with no presumption of correctness. *Rye v. Women's Care Ctr. of Memphis, MPLLC*, 477 S.W.3d 235, 250 (Tenn. 2015) (citing *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997); *Abshure v. Methodist Healthcare-Memphis Hosp.*, 325 S.W.3d 98, 103 (Tenn. 2010)). As part of our review, we must "take the strongest legitimate view of the evidence in favor of the

nonmoving party, allow all reasonable inferences in favor of that party, and discard all countervailing evidence." *Byrd v. Hall*, 847 S.W.2d 208, 211 (Tenn. 1993) (citations omitted), *holding modified by* *Hannan v. Alltel Publ'g Co.*, 270 S.W.3d 1 (Tenn. 2008), *holding modified by* *Rye*, 477 S.W.3d 235. We similarly accept the evidence presented by the nonmoving party as true and resolve any doubts about the existence of a genuine issue of material fact in its favor. *TWB Architects, Inc. v. Braxton, LLC*, 578 S.W.3d 879, 887 (Tenn. 2019) (citing *Martin v. Norfolk S. Ry.*, 271 S.W.3d 76, 84 (Tenn. 2008)).

A party is entitled to summary judgment only if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Tenn. R. Civ. P. 56.04. When the party moving for summary judgment does not bear the burden of proof at trial, it "may satisfy its burden of production either (1) by affirmatively negating an essential element of the nonmoving party's claim or (2) by demonstrating that the nonmoving party's evidence *at the summary judgment stage* is insufficient to establish the nonmoving party's claim or defense." *Rye*, 477 S.W.3d at 264. When a motion for summary judgment is made and supported as provided in Rule 56, the nonmoving party may not rest on the allegations or denials in its pleadings. *Id.* at 265. Instead, the nonmoving party must respond with specific facts showing that there is a genuine issue of material fact to be resolved at trial. *Id.*

## IV. ANALYSIS

### A.

We begin with the trial court's ruling that Westport lacked standing to pursue a legal malpractice claim against Howard Tate. Whether a plaintiff has standing to pursue its claim is a threshold issue. *See* *Connell v. Scullark*, No. W2014-00587-COA-R3-CV, 2014 WL 6882298, at *2 (Tenn. Ct. App. Dec. 8, 2014) (noting that standing is "a threshold matter"). As explained by our supreme court,

> Courts use the doctrine of standing to determine whether a litigant is entitled to pursue judicial relief as to a particular issue or cause of action. *ACLU of Tenn. v. Darnell*, 195 S.W.3d 612, 619 (Tenn. 2006); *Knierim v. Leatherwood*, 542 S.W.2d 806, 808 (Tenn. 1976). The proper focus of a determination of standing is a party's right to bring a cause of action, and the likelihood of success on the merits does not factor into such an inquiry. *Darnell*, 195 S.W.3d at 620; *Petty v. Daimler/Chrysler Corp.*, 91 S.W.3d 765, 767–68 (Tenn. Ct. App. 2002). Every standing inquiry requires a "careful judicial examination of a complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the particular claims asserted." *Allen v. Wright*, 468 U.S. 737, 752, 104 S. Ct. 3315, 82 L. Ed. 2d 556 (1984).

*City of Memphis v. Hargett*, 414 S.W.3d 88, 97 (Tenn. 2013).

In this case, the trial court ruled as a matter of law that Westport lacked standing to bring a legal malpractice claim against Howard Tate because Westport did not enjoy an attorney-client relationship with the law firm. The trial court further rejected Westport's argument that it was entitled to pursue the legal malpractice claim under the theories of express or equitable subrogation, finding instead that Brands had assigned its right to prosecute the lawsuit to Westport. And the trial court noted that the Tennessee Supreme Court has specifically held that the assignment of legal malpractice actions is not permitted for public policy reasons. *See Can Do, Inc. Pension & Profit Sharing Plan & Successor Plans v. Manier, Herod, Hollabaugh & Smith*, 922 S.W.2d 865 (Tenn. 1996) (discussed in detail, *infra*).

On appeal, Westport asserts that it has standing both individually and as a subrogee of Brands, which we will consider in turn. We begin with Westport's contention that it can maintain a direct action for legal malpractice against Howard Tate. In support of this theory, Westport cites two Tennessee Supreme Court cases, *Stinson v. Brand*, 738 S.W.2d 186 (Tenn. 1987), and *Collins v. Binkley*, 750 S.W.2d 737 (Tenn. 1988).

In *Stinson*, the plaintiff sellers were harmed when they failed to record a deed of trust. The sellers alleged that the attorney who prepared the deed of trust, and in particular the attorney's assistant with whom they interacted, failed to advise them to do so. *Id.* at 188–89. Although the trial court dismissed the claims, the Tennessee Supreme Court reversed. In so doing, the Tennessee Supreme Court explained that not only did the sellers make out a claim for negligent misrepresentation, as discussed *infra*, but they also may have made out a claim for professional negligence: "[The attorneys] so far involved themselves in the transaction that a trier of fact could find that they were representing multiple interests, not just the purchaser, and could be liable to [the sellers] for negligence on that basis." *Id.* at 190. As the court explained,

We recognize that [the attorneys] insist that they represented only [the buyer] in this case and that they followed his instructions to the letter. At best, however, the transaction was loosely and inexpertly handled, with a legal secretary being permitted to conduct an apparently routine matter without submitting the legal documents to her employers for approval. A jury could find that [the attorneys] intended to charge [the sellers] for preparing the note and deed of trust, in which case they would clearly have been acting for the sellers. Even without charging the sellers, [the attorneys] may be found to have been acting for them by naming one of the [attorneys] as trustee for the sellers. And even if no attorney-client relationship existed or was intended, [the attorneys] could be liable for negligence under the principles of [negligent misrepresentation].

- 8 -

*Id.* at 191.

Later, in **Collins**, the Tennessee Supreme Court held that the trial court should not have dismissed the plaintiff's cause of action, citing **Stinson** and another case involving negligent misrepresentation.[6] 750 S.W.2d at 739. Rather, the court held that the evidence presented in that case could "give rise to the duty of an attorney to non-clients and may result in liability for the damages sustained by non-clients." *Id.*

Respectfully, Westport misapprehends the holdings in **Collins** and **Stinson**. As an initial matter, **Collins** does not discuss legal or professional malpractice in any way, but rather relies heavily on a prior case involving only negligent misrepresentation; as such, it is inapposite to the question of whether Westport can maintain a direct action of legal malpractice against Howard Tate.

It is true, however, that **Stinson** held that the plaintiff sellers may have a cognizable legal malpractice claim against the attorneys in addition to a negligent misrepresentation claim. But the basis of this claim was not simply that the sellers relied on the advice of the attorneys, but that the facts could give rise to an inference that the sellers were actually the clients of the attorneys. *See* **Stinson**, 738 S.W.2d at 189–90 ("An inference could be drawn from the testimony . . . that the law firm should have charged the [sellers] for these instruments."). Thus, as set forth in the block quote above, there were disputed facts as to who was actually the client of the defendant attorneys in **Stinson**. And the court clearly held that "if no attorney-client relationship existed or was intended," the sellers' only recourse was an action for negligent misrepresentation. *Id.* at 191. Indeed, Tennessee courts applying **Stinson** have continued to hold that "[t]he cause of action for malpractice . . . differs from a cause of action for negligent misrepresentation, in that a cause of action for malpractice requires an employment relationship or privity, whereas an action for negligent misrepresentation does not." **McNamara v. Monroe**, No. E2002-00407-COA-R3-CV, 2003 WL 192161, at \*2 (Tenn. Ct. App. Jan. 29, 2003) (citing **Stinson**, 738 S.W.2d 186).

In this case, however, Westport does not dispute that it was never a client of Howard Tate in the Underlying Lawsuits. Indeed, Tennessee law makes abundantly clear that an insurance carrier providing counsel on behalf of the insured is not the client to whom any duties are owed. Rather, the Tennessee Supreme Court has explained that

> The obligation to defend the insured under a contract of insurance obviously contemplates representation by counsel who can exercise professional judgment and **devote complete loyalty to the insured**

---

[6] *See* **Tartera v. Palumbo**, 224 Tenn. 262, 453 S.W.2d 780, 784 (1970) (citing *Restatement (Second) of Torts* § 552 (involving negligent misrepresentation in the course of a business or profession) (discussed in detail, *infra*)).

regardless of the circumstances. The same loyalty is owed the client whether the attorney is employed and paid by the client, is a salaried employee of the insurer, or is an independent contractor engaged by the insurer.

*Petition of Youngblood*, 895 S.W.2d 322, 328 (Tenn. 1995) (emphasis added). As a result, we conclude that Tennessee law continues to provide that Westport cannot maintain a direct legal malpractice action in this matter in the absence of an attorney-client relationship.[7]

Westport next asserts that the trial court erred in holding that it had no standing as a contractual or equitable subrogee of Brands. Instead, the trial court held that Westport's efforts to assert the legal malpractice action on behalf of Brands actually constituted an assignment, and that assignments of legal malpractice claims are barred in Tennessee, citing *Can Do*. Westport responds that the trial court had no legal basis for ruling that its arrangement with Brands constituted an assignment rather than a subrogation. Moreover, Westport contends that the public policy reasons that led to the ruling in *Can Do* are not present in situations such as this. We agree with Westport on this point.

Subrogation is governed by "established principles" in Tennessee. *Blankenship v. Est. of Bain*, 5 S.W.3d 647, 650 (Tenn. 1999). As the Tennessee Supreme Court has explained,

Subrogation is defined as "the substitution of another person in the place of a creditor, so that the person in whose favor it is exercised succeeds to the rights of the creditor in relation to the debt." *Castleman Constr. Co. v. Pennington*, 222 Tenn. 82, 432 S.W.2d 669, 674 (1968) (citation omitted). Subrogation allows an insurer to "stand in the shoes" of an insured and assert the rights the insured had against a third party. *E.g.*, *Wimberly v. American Cas. Co.*, 584 S.W.2d 200, 203 (Tenn. 1979). In its most basic form, subrogation means that party A is substituted for party B and is allowed to raise the rights party B had against party C.

*Blankenship*, 5 S.W.3d at 650. A right of subrogation most often arises by contract or by application of equitable principles. *Id.* (noting also the existence of statutory subrogation). Contractual subrogation is fairly self-explanatory and is "the product of an agreement between insured and insurer[.]" 16 *Couch on Ins.* § 222:31. In contrast, this Court has provided the following explanation of equitable subrogation:

Equitable subrogation "'does not arise from any contractual relationship between the parties, but takes place as a matter of equity, with or without an

---

[7] Of course, the lack of attorney-client relationship is not a bar to Westport's negligent misrepresentation claim, which is addressed later in this Opinion.

agreement to that effect.'" ***Hartman v. State***, No. M2002-01430-COA-R3-CV, 2003 WL 1872648, *6 (Tenn. Ct. App. Apr. 14, 2003) (quoting 83 *C.J.S. Subrogation* § 4 (2000)). The purpose of equitable subrogation has been described as follows:

> It is an equitable doctrine designed to obtain substantial justice and to prevent wrongdoing. It arises when a person, even if for his own benefit, pays a debt for which another is also liable. The Tennessee Supreme Court has held that an insurer was subrogated to the rights its insured had against others when the insurer paid its insured's claim.

***Almany v. Nationwide Ins. Co.***, No. 85-341-II, 1987 WL 4745, *4 (Tenn. Ct. App. Jan. 29, 1987) (citations omitted). Equitable subrogation is based on the principle that "'substantial justice should be attained regardless of form, that is, its basis is the doing of complete, essential, and perfect justice between all the parties without regard to form.'" ***Castleman Constr. Co. v. Pennington***, 222 Tenn. 82, 432 S.W.2d 669, 674 (1968) (quoting 83 *C.J.S. Subrogation* §§ 1–2).

***Acuity v. McGhee Eng'g, Inc.***, 297 S.W.3d 718, 724 (Tenn. Ct. App. 2008).

Westport asserts that either contractual or equitable subrogation allows it to step into the shoes of Brands to assert a legal malpractice claim against Howard Tate. Howard Tate makes no distinction between contractual or equitable subrogation in its brief but argues that either type of claim is barred. The trial court agreed with Howard Tate on the basis that what occurred was not a subrogation of any kind but an assignment of Brands' claim to Westport. Although some cases outside our jurisdiction appear to draw a distinction between equitable and contractual subrogation in this context, the parties each cite outside cases without apparent concern for the type of subrogation alleged. As such, it does not appear that either party asserts that Westport's claims of contractual and equitable subrogation should be treated disparately in this particular case. We therefore refer to the claims of Westport generally as "insurance subrogation."

In support of the trial court's conclusion that an assignment, not a subrogation of either type, occurred in this case, Howard Tate cites the 1966 case of ***Wilson v. Tennessee Farmers Mutal Insurance Co.***, which held that "[s]ubrogation means substitution, not assignment or transfer. Subrogation operates only to secure contribution and indemnity; whereas, an assignment transfers the whole claim." 219 Tenn. 560, 565, 411 S.W.2d 699, 701 (1966).

The Tennessee Supreme Court, however, has described insurance subrogation in a way that encompasses what occurred in this case. Specifically, in ***Wimberly v. American***

***Casualty Co. of Reading, Pa. (CNA)***, the court noted that insurance subrogation actually has two purposes. 584 S.W.2d 200 (Tenn. 1979). The first is the context described by the ***Wilson*** court—to prevent "the unjust enrichment of the insured through a double recovery[.]" ***Id.*** at 203. The second purpose, however, is to prevent "a windfall benefit to the principal tortfeasor by allowing the insurer to stand in the shoes of the insured once the insurer has fully indemnified the insured." ***Id.***; *see also **Abbott v. Blount Cnty.***, 207 S.W.3d 732, 734 (Tenn. 2006) (noting that one "primary purpose" of subrogation is to "prevent . . . a windfall benefit to the principal tortfeasor" (quoting ***Wimberly***, 584 S.W.2d at 203)).

Moreover, following the issuance of ***Wilson***, the Tennessee Rules of Civil Procedure were adopted in this State. Among these rules is Rule 17.01, which provides in relevant part that

> Every action shall be prosecuted in the name of the real party in interest; but an executor, administrator, guardian, bailee, trustee of an express trust, a party to whose rights another is subrogated, a party with whom or in whose name a contract has been made for the benefit of another, or a party authorized by statute may sue in his or her own name without joining the party for whose benefit the action is brought . . . .

Tenn. R. Civ. P. 17.01. Relying on Rule 17.01, the Tennessee Supreme Court has explicitly held that an insurance company may bring an action against a third party in its own name as the real party in interest:

> Upon payment by the insurer of a loss, it becomes the real party in interest with respect to the subrogation claim, ***National Cordova Corp. v. City of Memphis***, 214 Tenn. 371, 380 S.W.2d 793 (1964), and has the right to bring suit in the name of the insured, ***Emmoco Ins. Co. v. Beacon Mut. Indemnity Co.***, 204 Tenn. 540, 322 S.W.2d 226 (1959), **or in its own name.** Rule 17.01, Tennessee Rules of Civil Procedure. The insurer may intervene in an action brought by the insured against a wrongdoer and assert its subrogation claim therein. ***Globe & Rutgers Fire Ins. Co. v. Cleveland***, 162 Tenn. 83, 34 S.W.2d 1059 (1931); but, it cannot bring suit against the wrongdoer after judgment has been rendered in the insured's action. ***Ibid. Accord National Cordova Corp. v. City of Memphis***, *supra*. In short, the subrogation claim is the property of the insurer to deal with as it pleases so long as the rights of others, e.g., the insured or the wrongdoer, are not prejudiced.

***Travelers Ins. Co. v. Williams***, 541 S.W.2d 587, 590 (Tenn. 1976) (emphasis added); *see also **Patton v. Pearson***, No. M2022-00708-COA-R3-CV, 2023 WL 3815062, at *3 (Tenn. Ct. App. June 5, 2023) ("They note that Tennessee law recognizes an ability for insurers to bring subrogation actions in the name of the insured. The Pattons are correct on this point . . . .").

Here, there appears to be no dispute that Westport has fully paid the debt of Brands in the Underlying Lawsuits.[8] Having paid for that loss, Westport's insurance contract allows it to step into the shoes of Brands as the real party in interest and seek recovery against Howard Tate "in its own name." **Williams**, 541 S.W.2d at 590; *see also* **Old Republic Life Ins. Co. v. Woody**, 652 S.W.3d 418, 429 (Tenn. Ct. App. 2022) ("Subrogation allows an insurer to 'stand in the shoes' of an insured and assert such rights as the insured had against a third party[.]"), *perm. app. denied* (Tenn. Aug. 4, 2022). This action therefore constitutes a subrogation of the second type recognized by the Tennessee Supreme Court. *See* **Wimberly**, 584 S.W.2d at 203. As such, the trial court erred in concluding that Westport was bringing this action following an assignment from Brands. *See generally* **Almany v. Nationwide Ins. Co.**, No. 85-341-II, 1987 WL 4745, at *4 (Tenn. Ct. App. Jan. 29, 1987) ("Subrogation is not an assignment." (citing **Wilson**, 411 S.W.2d at 701)); *see also* **Elec. Ins. Co. v. Nationwide Mut. Ins. Co.**, 384 F. Supp. 2d 1190, 1193 (W.D. Tenn. 2005) (applying Tennessee law to hold that "[a] right to subrogation, however, is not an assignment" and therefore denying the defendant's motion to dismiss a claim for bad faith refusal to settle by a subrogee of the insured predicated on Tennessee's prohibition of assignments of those types of claims).

Moreover, many of the public policy considerations that led the **Can Do** court to hold that legal malpractice claims cannot be assigned on the commercial marketplace are not present in the context of insurance subrogation. A brief recitation of the facts and analysis in **Can Do** is therefore helpful. In **Can Do**, the sole member and primary beneficiary of a pension and profit-sharing plan filed a voluntary bankruptcy action. 922 S.W.2d at 866. In the course of the bankruptcy, certain assets, including "any cause of action" against the law firm at issue, were transferred to the plaintiff pension and profit-sharing plan by the bankruptcy trustee. *Id.* Following the transfer, the plaintiff filed a complaint asserting that the law firm's mismanagement of the member's estate resulted in his bankruptcy. The law firm moved to dismiss the complaint on the ground that it sounded in legal malpractice and could not be assigned to the plaintiff as a matter of law. *Id.* The trial court agreed and dismissed the complaint, but this Court reversed, holding that the action could be assigned because it survived the death of the assignor. *Id.*

The Tennessee Supreme Court first rejected the survivability test as the appropriate method for determining whether a legal malpractice action could be assigned. Instead, the court held that "in resolving the question of assignability of legal malpractice actions, public policy considerations, rather than the traditional survivability test, should guide the analysis." *Id.* at 869.

The court further concluded that public policy did not favor the assignment of legal

---

[8] Howard Tate also did not dispute that "Brands is fully aware and supportive of [Westport's] claims against Howard Tate."

- 13 -

malpractice actions due to "the unique character of legal services, the personal nature of the attorney's duty to the client, and the confidentiality of the attorney-client relationship." As the court quoted from a California appellate decision:

> The assignment of such claims could relegate the legal malpractice action to the market place and convert it to a commodity to be exploited and transferred to economic bidders who have never had a professional relationship with the attorney and to whom the attorney has never owed a legal duty, and who have never had any prior connection with the assignor or his rights. The commercial aspect of assignability of choses in action arising out of legal malpractice is rife with probabilities that could only debase the legal profession. The almost certain end result of merchandizing such causes of action is the lucrative business of factoring malpractice claims which would encourage unjustified lawsuits against members of the legal profession, generate an increase in legal malpractice litigation, promote champerty and force attorneys to defend themselves against strangers. The endless complications and litigious intricacies arising out of such commercial activities would place an undue burden on not only the legal profession but the already overburdened judicial system, restrict the availability of competent legal services, embarrass the attorney-client relationship and imperil the sanctity of the highly confidential and fiduciary relationship existing between attorney and client.

*Id.* at 868–69 (quoting ***Goodley v. Wank & Wank, Inc.***, 62 Cal. App. 3d 389, 397, 133 Cal. Rptr. 83, 87 (Cal. Ct. App. 1976)).

The Tennessee Supreme Court further explained that its chief concerns involved endangering the attorney-client duties of loyalty and confidentiality and perpetuating the commercialization of legal malpractice claims. As to the duty of loyalty and the fear of commercialization, the court worried that "[t]hose who are not privy to the relationship" would be "pursuing interests adverse to the client's interests." *Id.* at 869 ("An adversary might well make a favorable settlement offer to a judgment-proof or financially strapped client in exchange for the assignment of that client's right to bring a malpractice claim against his attorney. Lawyers involved in such negotiations would quickly realize that the interests of their clients were incompatible with their own self-interest.") (quoting ***Picadilly, Inc. v. Raikos***, 582 N.E.2d 338, 343–44 (Ind. 1991), *abrogated on other grounds by **Liggett v. Young***, 877 N.E.2d 178 (Ind. 2007)). Assignment could therefore "undermine the fundamental structure and function of the relationship and create a risk of collusion that must not be countenanced." *Id.* (citing ***City of Garland v. Booth***, 895 S.W.2d 766, 770 (Tex. Ct. App. 1995) (noting that commercialization of legal malpractice lawsuits would "encourage unjustified lawsuits against members of the legal profession, generate an increase in legal malpractice litigation, promote champerty and force attorneys to defend themselves against strangers" (quoting ***Goodley v. Wank & Wank, Inc.***, 62 Cal. App. 3d

389, 397, 133 Cal. Rptr. 83, 87 (Cal. Ct. App. 1976)))). The court further explained that the duty of confidentiality was in jeopardy because an "assignee controls the claim and may have little or no concern for the client's sensitivities." *Id.* (noting that attorneys defending against legal malpractice claims can reveal confidential information; while the client can drop the lawsuit to prevent disclosure, this action is not available post-assignment).

Respectfully, the concerns highlighted by our supreme court in **Can Do** are not present to the same extent in the insurance subrogation context. It is true that even when an insurer provides an attorney for its insured, the fiduciary duties owed to the client by the lawyer are not altered. *See **Petition of Youngblood***, 895 S.W.2d at 328. However, it cannot be said that Westport is a stranger to this matter who has no prior connection to Brands. Pursuant to Brands' contractual policy of insurance, Westport was given the duty to choose Brands' counsel for this matter and it was therefore Westport that retained Howard Tate. Thus, Westport was more than "privy to the relationship" between Brands and Howard Tate, it was an integral member of the "tripartite" relationship between the three entities. *Id.* Moreover, because Westport was contractually obligated to pay its policy limits in the event that Brands was found liable in the Underlying Lawsuits, Westport's and Brands' interests were not adverse. Finally, the reality of the tripartite relationship between Howard Tate, Brands, and Westport necessitates that strict confidentiality has been waived in this case.

We begin with the duty of loyalty in light of the relationship between the parties in the insurance subrogation context. In ***Atlanta International Insurance Co. v. Bell***, for example, the Michigan Supreme Court held that the "unique" relationship between insurer and insured in this situation permitted equitable subrogation of a legal malpractice claim, even where assignment was not permitted. 438 Mich. 512, 522, 475 N.W.2d 294 (Mich. 1991). As the court explained:

> The defense counsel-insurer relationship is unique. The insurer typically hires, pays, and consults with defense counsel. The possibility of conflict unquestionably runs against the insured, considering that defense counsel and the insurer frequently have a longstanding, if not collegial, relationship.
> In a malpractice action against a defense counsel, however, the interests of the insurer and the insured generally merge. The client and the insurer both have an interest in not having the case dismissed because of attorney malpractice. Allowing recovery for the insurer on the basis of the failure of defense counsel to adhere to basic norms of duty of care thus would not substantially impair an attorney's ability to make decisions that require a choice between the best interests of the insurer and the best interests of the insured. The best interests of both insurer and insured converge in expectations of competent representation.

- 15 -

***Id.*** (quotation marks, internal citations, and footnote omitted).

Thus, the Michigan Supreme Court held that by prohibiting an insurer from raising a claim of legal malpractice on behalf of its insured, the court was not actually preserving the attorney-client relationship, but only insulating a negligent attorney from liability and shifting the loss onto the insurer. ***Id.***; *see also* ***Am. Centennial Ins. Co. v. Canal Ins. Co.***, 843 S.W.2d 480, 484 (Tex. 1992) ("Recognizing an equitable subrogation action by the excess carrier against defense counsel would not, however, interfere with the relationship between the attorney and the client nor result in additional conflicts of interest. Subrogation permits the insurer only to enforce existing duties of defense counsel to the insured."). Thus, the duty of loyalty to the client is not undermined by allowing an insurer, who has the same motives and desires as the insured to limit liability, to seek redress against an allegedly negligent attorney.

Likewise, the Florida Supreme Court has held that public policy does not prohibit contractual subrogation of legal malpractice claims because the concern regarding the creation of "'a market for legal malpractice claims' . . . does not exist in these circumstances." ***Arch Ins. Co. v. Kubicki Draper, LLP***, 318 So. 3d 1249, 1255 (Fla. 2021) (quoting ***Cowan Liebowitz & Latman, P.C. v. Kaplan***, 902 So. 2d 755, 760–61 (Fla. 2005)). As the court explained,

> The subrogated claim originates by contract from the insured to the insurer, the same entity who hired the lawyer in the first instance. *See* 16 *Couch on Insurance* § 222:31 ("'Conventional subrogation' is contractual in nature, the product of an agreement between insured and insurer."). The insurer is not a "stranger" to the attorney who is "bidding" on a cause of action and "exploiting" it. To the contrary, the insurer is trying to recover money it paid to its insured from the lawyer it hired. The lawyer is on notice of subrogation claims included in the policy, and Florida public policy does not support shielding the law firm from accountability for its professional malpractice. To the contrary, subrogation exists to hold premium rates down by allowing the insurers to recover indemnification payments from the tortfeasor who caused the injury. *See* ***Cunningham v. Metro. Life Ins. Co.***, 121 Wis. 2d 437, 360 N.W.2d 33, 37 (1985) (subrogation "returns the excess, duplicative proceeds to the insurer who can then recycle them in the form of lower insurance premiums"); s*ee also* 22 Eric Mills Holmes, *Appleman on Insurance* § 141.1[D][3] (2d ed. 2003) ("Subrogation advances an important public policy by forcing the tortfeasor to bear the burden of reimbursing the insurer for indemnity payments to its insured."); 16 *Couch on Insurance* § 222:8 ("When the insurer has made payment for the loss caused by a third party, it is only equitable and just that the insurer should be reimbursed for its payment to the insured, because otherwise either the insured would be unjustly enriched by virtue of a recovery from both the insurer and the third

party, or in the absence of such double recovery by the insured, the third party would go free notwithstanding the fact that he or she has a legal obligation in connection with the damage.").

*Arch Ins. Co.*, 318 So. 3d at 1255); *see also* **St. Paul Fire & Marine Ins.**, 379 F. Supp. 2d at 194 ("[B]ecause the relationship between the insurer and insured that gives rise to subrogation preexists the malpractice and the malpractice claim, and subrogation rights are limited to insurers who, under a legal duty, have paid an insured's loss, subrogation presents fewer concerns that malpractice claims will end up in the hands of a remote party or a former adversary." (quotation marks and citation omitted)).

Using similar reasoning, a federal district court applying Illinois law concluded that there was little risk that allowing the subrogation of malpractice claims would encourage frivolous lawsuits:

> Unlike assignment, subrogation would not lead to the merchandising of malpractice claims. Though a claim can be assigned to anyone willing to pay for it, subrogation rights can be exercised only by those who have fulfilled a duty, imposed by contract or law, to pay for another's loss. Thus, allowing subrogation of legal malpractice claims would not make them a commodity available to the highest bidder.
>
> Subrogation would also not encourage baseless lawsuits. . . . [I]nsurers have no more or less incentive to file malpractice suits than do the uninsured. Faced with a large judgment caused by malpractice, both would want to shift some or all of the liability to the attorneys who mishandled the case.

*TIG Ins. Co. v. Chicago Ins. Co.*, No. 00 C 2737, 2001 WL 99832, at *2–3 (N.D. Ill. Feb. 1, 2001).

Finally, the duty of confidentiality is not threatened as a result of allowing Westport to bring a malpractice action on behalf of Brands. Indeed, in the insurance subrogation context confidentiality has typically already been waived by the insured when an insurance company is obliged to defend a claim against it. For example, in **St. Paul Fire & Marine Insurance Co. v. Birch, Stewart, Kolasch & Birch, LLP.**, the court noted that confidentiality was not a concern where the insured "had voluntarily waived its attorney-client privilege" and "was a sophisticated business entity that could fully appreciate the cost and benefit of waiving its privilege." 379 F. Supp. 2d 183, 192 (D. Mass. 2005) (quoting *New Hampshire Ins. Co., v. McCann*, 429 Mass. 202, 707 N.E.2d 332 (Mass. 1999) (allowing assignments of legal malpractice actions in some circumstances)), *order confirmed sub nom.* **St. Paul Fire & Marine Ins. Co. v. Birch, Stewart, Kolasch & Birch, LLP**, 408 F. Supp. 2d 59 (D. Mass. 2006). The same is true here, as Brands' insurance policy specifically states that it would provide all information and documentation requested

by Westport and do everything necessary to allow Westport to exercise its subrogation rights. There is no allegation that Brands is an unsophisticated party incapable of appreciating such an agreement. Moreover, the confidentiality provisions of the Guidelines envision a "tripartite relationship" with regard to the flow of information. Howard Tate readily agreed to abide by these Guidelines. As such, Howard Tate should not be permitted to wield the duty of confidentiality owed to a party fully consenting to this suit as a shield to prevent liability for its alleged malpractice.

As previously discussed, the Tennessee Supreme Court has explicitly held that one primary purpose of subrogation in Tennessee is to prevent a windfall to a tortfeasor. *Abbott*, 207 S.W.3d at 734 (quoting *Wimberly*, 584 S.W.2d at 203). To arbitrarily prohibit an insurance subrogee from prosecuting a legal malpractice action on behalf of its insured, however, would frustrate this purpose and instead allow allegedly negligent attorneys to shield themselves "from the consequences of legal malpractice." *St. Paul Fire & Marine Ins.*, 379 F. Supp. 2d at 194 (quoting *New Hampshire Ins.*, 707 N.E.2d at 336). The risk of immunizing negligent attorneys is particularly high in the insurance subrogation context, as an insurer only has a right of subrogation after fully paying an insured's debt. Having been fully compensated for a loss, the insured "has little incentive to sue for legal malpractice[.] *Id.* To hold otherwise, would be to shift the burden of loss from the wrongdoer to an innocent insurance provider. Finally, immunizing only legal malpractice claims in this way could undermine public confidence in the legal profession "by creating the perception that the system provides attorneys with unjustified special protection." *Id.* (quoting *New Hampshire Ins.*, 707 N.E.2d at 337).

It is true, however, that the position that we adopt in this case is not a clear majority in the states that have considered it. In *State Farm Fire & Casualty Co. v. Weiss*, the Colorado Court of Appeals noted that of the courts that had considered this issue at the time, the majority "prohibit[ed] the equitable subrogation of professional negligence claims against attorneys." 194 P.3d 1063, 1066 (Colo. App. 2008). For many, the reasons for prohibiting assignment of legal malpractice claims were held to be equally applicable to equitable subrogation, ultimately with the aim to protect the attorney-client relationship from "interference and intrusion" of a "subrogee as a stranger." *Id.* at 1066–68 (collecting cases); *see also* 50 A.L.R.6th 53 (2009) (collecting "all the cases that have discussed the right of an insurer to assert an equitable subrogation claim against an attorney for the insured on grounds of professional malpractice").

However, other jurisdictions have, like this Court, come to the opposite conclusion due to the fact that these concerns are simply not present to the same extent in the insurance subrogation context. *See, e.g.*, *St. Paul Fire & Marine Ins.*, 379 F. Supp. 2d at 195 ("[A] number of jurisdictions that have prohibited the assignment of legal malpractice claims have permitted the subrogation of such claims." (citing *Nat'l Union Ins. Co. v. Dowd & Dowd, P.C.*, 2 F. Supp. 2d 1013, 1023 (N.D. Ill. 1998) (applying Illinois law and concluding that Illinois Supreme Court would permit excess insurer, as subrogee of

insured, to bring legal malpractice action although Illinois courts prohibit assignment of such claims); *American Centennial Ins.*, 843 S.W.2d at 483–84; *Atlanta Int'l Ins. Co.*, 475 N.W.2d at 299)). While we do not minimize the concerns that led the *Can Do* court to prohibit, on public policy grounds, the commercialization of legal malpractice claims through assignment, we must conclude that those concerns, diminished as they are in the insurance subrogation context, do not outweigh the clear policy underpinning subrogation that damages be paid by wrongdoers. *See also* *TIG Ins.*, 2001 WL 99832, at *3 ("In short, any danger that subrogation poses to the integrity of the attorney-client relationship seems far more theoretical than real."). Rather, "[t]he only winner produced by an analysis precluding liability" based on an arbitrary prohibition divorced from the realities of the insurance subrogation context "would be the malpracticing attorney." *Great Am. E & S Ins. Co. v. Quintairos, Prieto, Wood & Boyer, P.A.*, 100 So. 3d 453, 467 (Miss. Ct. App.) (quoting *Atlanta Int'l Ins. Co.*, 438 Mich. 512, 475 N.W.2d at 298) (finding that Mississippi law allows for both assignment and equitable subrogation of legal malpractice claims), *aff'd in part, rev'd in part*, 100 So. 3d 420 (Miss. 2012). We therefore conclude that public policy does not prohibit Westport from bringing a legal malpractice action against Howard Tate as subrogee of Brands.

**B.**

The trial court also relied on an alternative ground to grant summary judgment in favor of Howard Tate: that a reasonable judge would not have granted a motion to dismiss for lack of personal jurisdiction in the Underlying Lawsuits. Thus, the trial court found that Howard Tate had negated an essential element of Westport's legal malpractice action. Westport argues that this ruling was in error and that summary judgment should be granted in its favor on this issue.

In order to sustain a legal malpractice action, the plaintiff must show the following: "(1) the defendant attorney owed a duty to plaintiff; (2) the attorney breached that duty; (3) the plaintiff suffered damages; and (4) the breach proximately caused the plaintiff's damage." *Tenn-Fla Partners v. Shelton*, 233 S.W.3d 825, 830 (Tenn. Ct. App. 2007) (citing *Horton v. Hughes*, 971 S.W.2d 957, 959 (Tenn. Ct. App. 1998)).

This case focuses in particular on the element of damages. "[A] plaintiff in a legal malpractice case has been damaged when liability has been imposed upon it or when it has lost a legal right, remedy, or interest." *Austin v. Sneed*, No. M2006-00083-COA-R3-CV, 2007 WL 3375335, at *5 (Tenn. Ct. App. Nov. 13, 2007) (citations omitted). "In order to prove damages in a legal malpractice action, a plaintiff must prove that he would have obtained relief in the underlying lawsuit, but for the attorney's malpractice; consequently, the trial of a legal malpractice claim becomes, in effect, a 'trial within a trial.'" *Shearon v. Seaman*, 198 S.W.3d 209, 214 (Tenn. Ct. App. 2005) (citing *Gibson v. Trant*, 58 S.W.3d 103, 108 (Tenn. 2001)); *see also Austin*, 2007 WL 3375335, at *5 (explaining that "the plaintiff must prove that it had a meritorious claim or remedy that it lost or that it was found

liable when it should not have been due to its attorney's negligence").

In undertaking this analysis, courts apply "an objective standard when determining whether a former client would have prevailed in the underlying suit." ***Austin***, 2007 WL 3375335, at \*5. "Under an objective standard, the trier of fact views the underlying suit from the standpoint of what a reasonable judge or jury would have decided but for the attorney's negligence." ***Id.*** Because the question of personal jurisdiction is an issue of law for the judge to decide, *see* ***Gordon v. Greenview Hosp., Inc.***, 300 S.W.3d 635, 645 (Tenn. 2009), the question of whether a reasonable judge would have granted a motion to dismiss for lack of personal jurisdiction in the Underlying Lawsuits is also a question of law for the court to decide. *See* ***Hawthorne v. Morgan & Morgan Nashville PLLC***, No. W2020-01495-COA-T10B-CV, 2020 WL 7395918, at \*3 (Tenn. Ct. App. Dec. 17, 2020) (holding that because the jury does not approve a settlement, the question of whether a reasonable judge in the prior suit would have approved a settlement for purposes of the damages element of a legal malpractice "is for the court"). Thus, summary judgment on this issue is often appropriate.[9] *See* ***CAO Holdings, Inc. v. Trost***, 333 S.W.3d 73, 81 (Tenn. 2010) ("Summary judgments are appropriate in virtually any civil case that can be resolved on the basis of legal issues alone.").

Thus, we must determine in this appeal whether Brands could have obtained dismissal of the Underlying Lawsuits on the basis of lack of personal jurisdiction. *See* ***Shearon***, 198 S.W.3d at 214 ("Therefore, we must examine what Shearon was required to prove in order to obtain relief in the worker's compensation lawsuit, and the evidence considered by the trial court."). Here, the trial court ruled that a reasonable judge would have concluded that Tennessee had both specific and general jurisdiction over Brands in the Underlying Lawsuits.

In general, Tennessee law allows our courts "to exercise jurisdiction upon, inter alia, '[a]ny basis not inconsistent with the constitution of this state or of the United States.'" ***Id.*** at 646 (quoting ***Mfrs. Consolidation Serv., Inc. v. Rodell***, 42 S.W.3d at 846, 855 (Tenn. Ct. App. 2000)). As the Tennessee Supreme Court has more fully explained,

> Tennessee courts have generally held that the due process requirements of the Constitution of Tennessee are co-extensive with those of the United States Constitution. ***Gallaher v. Elam***, 104 S.W.3d 455, 463 (Tenn. 2003); ***Newton v. Cox***, 878 S.W.2d 105, 110 (Tenn. 1994). . . .
> Approximately sixty years ago, the United States Supreme Court noted that personal jurisdiction could be exercised over a nonresident

---

[9] Indeed, both parties sought summary judgment on this issue, each arguing that the undisputed facts entitled it to judgment as a matter of law. Neither party on appeal asserts that there are factual disputes that must be resolved in order to adjudicate this issue, nor do they argue that resolution of this issue requires the trial court to weigh the evidence, such that summary judgment would be inappropriate.

defendant only if the defendant has "certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S. Ct. 154, 90 L. Ed. 95 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463, 61 S. Ct. 339, 85 L. Ed. 278 (1940)); *see also **J.I. Case Corp. v. Williams***, 832 S.W.2d 530, 531–32 (Tenn. 1992). This is a two-part test which requires evaluating whether the requisite minimum contacts are present and whether the exercise of jurisdiction is fair. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476, 105 S. Ct. 2174, 85 L.Ed.2d 528 (1985).

The defendant's contacts with the forum state need not be physical, and the court will primarily examine the quantity of the contacts, their nature and quality, and the relationship between the contacts and the cause of action. As part of its evaluation of the reasonableness of exercising jurisdiction, the court "must consider the burden on the defendant, the interests of the forum State, and the plaintiff's interest in obtaining relief. It must also weigh in its determination 'the interstate judicial system's interest in obtaining the most efficient resolution of controversies[,] and the shared interest of the several States in furthering fundamental substantive social policies.'" *Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 113, 107 S. Ct. 1026, 94 L. Ed. 2d 92 (1987) (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292, 100 S. Ct. 559, 62 L. Ed. 2d 490 (1980)).

*Gordon*, 300 S.W.3d at 646–47 (footnote and some citations omitted).

Tennessee, like other jurisdictions, recognizes two types of personal jurisdiction: specific and general. Specific jurisdiction

may be asserted when the plaintiff's cause of action arises from or is related to the nonresident defendant's activities in or contacts with the forum state. To invoke specific jurisdiction, a plaintiff must show (1) that the nonresident defendant has purposely established significant contact with the forum state and (2) that the plaintiff's cause of action arises out of or is related to these activities or contacts. The nonresident defendant's contacts with the forum state must be sufficient to enable a court to conclude that the defendant "should reasonably anticipate being haled into court [in the forum state]." If the plaintiff can make that showing, the defendant will have the burden of showing that the exercise of specific jurisdiction would be unfair.

*Id.* at 647 (footnote and citations omitted).

In contrast, general jurisdiction

may be asserted when the plaintiff's cause of action does not arise out of and is not related to the nonresident defendant's activities in the forum state. The threshold for satisfying the requirements for general jurisdiction is substantially higher than the requirements for establishing specific jurisdiction. An assertion of general jurisdiction must be predicated on substantial forum-related activity on the part of the defendant. The nonresident defendant's contacts with the forum state must be sufficiently continuous and systematic to justify asserting jurisdiction over the defendant based on activities that did not occur in the forum state.

*Id.* at 647–48 (citations omitted). To confer general jurisdiction, "the defendant must be engaged in longstanding business in the forum state, such as marketing or shipping products, or performing services or maintaining one or more offices there; activities that are less extensive than that will not qualify for general in personam jurisdiction." *Id.* at 648 (quoting 4 *Federal Practice and Procedure* § 1067.5, at 507). In determining whether general jurisdiction exists, we must consider whether the defendant's contacts are "'continuous and systematic' enough to warrant an assertion of general jurisdiction[,]" which, in turn, "requires ascertaining whether 'the continuous corporate operations within a state [are] so substantial and of such a nature as to justify suit against it on causes of action arising from dealings entirely distinct from those activities.'" *Id.* at 648 (quoting *Lindsey v. Trinity Commc'ns, Inc.*, 275 S.W.3d 411, 417 (Tenn. 2009)).

But a finding that a defendant has even continuous and systematic contact with our state is not enough to support the exercise of general jurisdiction:

Simply determining the presence of "continuous and systematic" contacts with the forum state is not alone sufficient to constitute the "exceptional case" . . . justifying the exercise of general jurisdiction over a nonresident corporation. Rather, a nonresident defendant's "affiliations with the State [must be] so 'continuous and systematic' as to render them essentially at home in the forum state." Furthermore, subjecting a nonresident defendant deemed to be "essentially at home" in the forum state to general jurisdiction also must accord with "the 'fair play and substantial justice' [that] due process demands."

Therefore, the appropriate determination of whether a nonresident corporation may be subject to general personal jurisdiction in Tennessee is whether the corporation has continuous and systematic contacts with Tennessee so substantial as to render the corporation "essentially at home" here in such a way which does not offend traditional notions of fair play and substantial justice.

*First Cmty. Bank, N.A. v. First Tenn. Bank, N.A.*, 489 S.W.3d 369, 385 (Tenn. 2015) (citations omitted) (citing *Daimler AG v. Bauman*, 571 U.S. 117, 136, 134 S. Ct. 746, 760,

187 L. Ed. 2d 624 (2014)). While "the paradigmatic forums in which a corporation's contacts with a state render it essentially at home are its state of incorporation and its principal place of business[,]" courts have recognized that in exceptional cases, other states may also meet these stringent requirements. *Baskin v. Pierce & Allred Constr., Inc.*, 676 S.W.3d 554, 568 (Tenn. 2023) (citations omitted).

We begin with specific jurisdiction, which only applies if the Underlying Lawsuits "arise[] from or [are] related to [Brands'] activities in or contacts with the forum state[.]" *Gordon*, 300 S.W.3d at 647; *see also Baskin*, 676 S.W.3d at 565 (holding that federal and Tennessee precedent "makes clear that for a court to exercise specific personal jurisdiction, a plaintiff's claim must arise out of or be related to the defendant's forum contacts." (citation omitted)). In other words, "[w]here a forum seeks to assert specific jurisdiction over an out-of-state defendant who has not consented to suit there," due process is satisfied when, at a minimum,[10] "the defendant has 'purposefully directed' his activities at residents of the forum, and the litigation results from alleged injuries that 'arise out of or relate to' those activities[.]" *Burger King*, 471 U.S. at 472 (footnote and internal citations omitted).

In concluding that Brands' activities met this requirement, the trial court made the following observations:

> The Court finds Brands' activities in the forum state giving rise to the underlying cause of action are based on the driving history check it performed on Mr. Brewer prior to his employment with Cool Runnings, Inc. The driving history check was requested by Mr. Brewer's employer, Cool Runnings, Inc., a Kentucky corporation. The specific tie related to Tennessee in the underlying suits is the fact that the motor vehicle accident occurred in Chattanooga, Tennessee. There has been no proof submitted to suggest any of Brands' Tennessee customers are in any way related to the motor vehicle accident or the underlying suits. The Court also notes the heightened foreseeability of a trucking accident occurring in Tennessee by a truck travelling between Kentucky and Florida. Taking the totality of this information into account, the Court finds Brands' activities with Tennessee giving rise to the underlying suits (i.e. driving history check) were intentional and do support a finding that Brands had sufficient minimum contacts with Tennessee.

On appeal, Howard Tate argues that the trial court was correct in its conclusion, citing the fact that Brands conducted business with customers who operated in Tennessee and the fact that it conducted a driving history check on an individual "whose operation in the state

---

[10] Tennessee also imposes additional fairness requirements that we need not address in this case. *See generally Crouch Ry. Consulting, LLC v. LS Energy Fabrication, LLC*, 610 S.W.3d 460, 485 (Tenn. 2020).

- 23 -

of Tennessee was . . . foreseeable." Respectfully, we disagree.

Here, the undisputed facts establish that Brands purposefully directed no actions to Tennessee as it relates to this particular case. The driving history check that gives rise to this claim was performed entirely outside of this State. This is the single act from which the claims at issue in the Underlying Lawsuits arise. Indeed, even the trial court acknowledged that there was no proof that any of Brands' Tennessee customers were related to the accident that gave rise to the Underlying Lawsuits.

Moreover, we conclude that both the trial court and Howard Tate erred in relying on the purported foreseeability that an individual for whom Brands performed a driving history check could operate in Tennessee. Indeed, the Tennessee Supreme Court has succinctly stated that "'foreseeability' alone has never been a sufficient benchmark for personal jurisdiction." ***First Cmty. Bank***, 489 S.W.3d at 390 (quoting ***World-Wide Volkswagen***, 444 U.S. at 295). Thus, "while foreseeability is 'critical to due process analysis,' the 'mere likelihood that a product will find its way into the forum State' is not alone sufficient." ***Id.*** at 389–90 (quoting ***World-Wide Volkswagen***, 444 U.S. at 297). Rather, the activities that give rise to the cause of action must have been "purposeful, deliberate[,]" and directed not simply to persons who reside in the forum state, but to the forum state itself. ***Id.*** (holding that necessary "contacts must arise out of the defendant's own purposeful, deliberate actions directed toward the forum state"). This requirement "ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts, or of the 'unilateral activity of another party or a third person.'" ***Id.*** (quoting ***Burger King***, 471 U.S. at 475).

Here, it was the unilateral activity of Cool Runnings to direct Mr. Brewer to operate in Tennessee. Nothing in the record suggests that Brands was even informed that Mr. Brewer was likely to operate in Tennessee. Simply put, Brands did not purposefully avail itself of the privilege of conducting business in Tennessee when it conducted the driving history check and there was no purposeful, deliberate contact with Tennessee from which the injuries alleged in the Underlaying Lawsuits arose. Instead, the fact that Mr. Brewer ended up operating a vehicle in Tennessee following the driver history check is analogous to a company placing a product in the stream of commerce that makes its way to the forum state. Just as that action, "without more, is not an act of the defendant purposefully directed toward the forum state[,]" ***id.*** at 390, so too was Brands' action in performing a driving history check entirely outside of the state of Tennessee, even with the possibility that the driver could eventually operate in the state. As a result, we must conclude, as a matter of law, that no reasonable judge could conclude that Tennessee had specific jurisdiction over Brands in the Underlying Lawsuits.

We therefore turn to consider the issue of general jurisdiction, which principally looks to whether Brands may be considered "essentially at home" in Tennessee. ***First Cmty. Bank***, 489 S.W.3d at 385. In support of its conclusion that Brands was subject to

- 24 -

general jurisdiction in Tennessee, the trial court focused on the following undisputed facts: (1) that Brands is a "nationwide" company doing business in 40 states, including Tennessee; (2) that in 2015, Brands "had a Tennessee non-resident insurance agent license and 50–100 clients in Tennessee" representing between 2.5% and 3% of Brands' gross revenue; and (3) that Brands' president admitted that he travels to Nashville frequently. The trial court noted other undisputed facts, however; namely that (1) Brands is incorporated and has its principal place of business in Ohio; (2) Brands has never owned or leased any office space in Tennessee and has never had an employee "posted in Tennessee"; and (3) Brands never solicited any business in Tennessee. Based on these facts and older United States Supreme Court cases,[11] the trial court concluded that "Brands has purposefully availed itself of the privilege of conducting business here by maintaining a customer base in Tennessee, profiting a substantial revenue from its customers in Tennessee, and by approving a trucker's driving history whose travel through Tennessee was quite foreseeable."

Respectfully, we disagree. As previously discussed, general jurisdiction will only be available in exceptional cases when the forum state is not the corporate defendant's state of incorporation or its principal place of business. *See Baskin*, 676 S.W.3d at 568. Moreover, "merely 'doing business' in a forum state clearly is not alone sufficient to subject a nonresident corporation to general jurisdiction there." *First Cmty. Bank*, 489 S.W.3d at 386 (citing *Daimler*, 134 S. Ct. at 761 n.19). "A corporation that operates in many places can scarcely be deemed at home in all of them." *Id.* (quoting *Daimler*, 134 S. Ct. at 762 n.20). The Tennessee Supreme Court has therefore held that general jurisdiction was not appropriate where the defendants were global companies doing business throughout the United States, earned about 1% of their gross revenue in the forum state, had employees that occasionally traveled to Tennessee, and had no office in Tennessee in which "senior management functions" were conducted. *Id.* at 387. In that case, our high court explained that while it was clear that the defendants engaged in business in Tennessee, their contacts with Tennessee were not so substantial as to render them essentially at home in Tennessee. *Id.*

Respectfully, the trial court's findings indicate that its focus was on whether Brands did business in Tennessee, rather than whether it was essentially at home here. The undisputed facts indicate that it is not. Like the defendants in *First Community Bank*, Brands is a nationwide company operating in about forty states. It is also true that Brands is licensed to conduct business in Tennessee and does so. Brands has no office in Tennessee, much less an office where senior management functions are conducted. Although more than the 1% revenues at issue in *First Community Bank*, Brands derives,

---

[11] *See Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 104 S. Ct. 1868, 80 L. Ed. 2d 404 (1984) (holding that the forum state could not exercise general jurisdiction over the foreign corporation based on one corporate trip to the forum state and the acceptance of checks drawn from a bank in the forum state); *Hanson v. Denckla*, 357 U.S. 235, 78 S. Ct. 1228, 2 L. Ed. 2d 1283 (1958) (not discussing general jurisdiction).

at most, 3% of its revenue from its Tennessee customers. *Cf.* ***Richardson v. Bates Show Sales Staff, Inc.***, No. M2012-01598-COA-R3-CV, 2013 WL 865547, at \*5 (Tenn. Ct. App. Mar. 6, 2013) (holding that Tennessee could not exercise general jurisdiction over a foreign defendant where, inter alia, business with Tennessee residents amounted to 2.3% of the defendant's business). Brands also does not direct any advertising to Tennessee. *Cf.* ***id.*** (noting that the defendant "does not advertise in Tennessee or directly market to Tennessee residents"). Simply put, the facts of this case do not amount to the kind of exceptional situation in which general jurisdiction may be exercised against a foreign company that is not incorporated in Tennessee and does not have any place of business here. So we must conclude that a reasonable judge would have granted motions to dismiss the Underlying Lawsuits based on lack of general jurisdiction.

In sum, we conclude that based on the undisputed facts in the record, a reasonable judge would have granted motions to dismiss the Underlying Lawsuits based on its conclusion that Tennessee could exercise neither specific nor general personal jurisdiction over Brands. As such, Howard Tate failed to negate the essential element of damages as to the negligence claim against Howard Tate. Instead, summary judgment should have been granted to Westport on this issue.[12]

## C.

Finally, Westport argues that the trial court erred in granting summary judgment to Howard Tate on its negligent misrepresentation claim. In dismissing this claim, the trial court concluded that Westport failed to establish that Howard Tate misrepresented "any past or present facts." Instead, the trial court characterized Westport's reliance on Howard Tate's legal advice as the basis for its misrepresentation claim. As the trial court explained,

> [Westport] . . . essentially admit[ted] there is no direct quote or statement they allege [Howard Tate] misrepresented; rather, [Westport] relies on the acts or omissions Howard Tate did or did not do in representing Brands in the Underlying [Laws]uits. For example, [Westport] complains [Howard Tate] did not notify them of his legal theories or plans of attack, such as the decision not to pursue the defense of lack of personal jurisdiction.

Westport asserts that the trial court misapplied Tennessee law in dismissing this claim.

As the Tennessee Supreme Court has explained,

To succeed on a negligent misrepresentation claim, a plaintiff must establish

---

[12] Although we conclude that a reasonable judge would have granted motions to dismiss the Underlying Lawsuits, this does not, ipso facto, lead to the conclusion that Howard Tate breached its standard of care in failing to file such motions. Indeed, the trial court denied Howard Tate's motion for summary judgment on that element, a ruling that Howard Tate has not appealed.

that: (1) the defendant supplied information to the plaintiff; (2) the information was false; (3) the defendant did not exercise reasonable care in obtaining or communicating the information; and (4) the plaintiffs justifiably relied on the information.

***Stanfill v. Mountain***, 301 S.W.3d 179, 189 (Tenn. 2009). In addition, this Court has held that "[t]he misrepresentation must consist of a statement of a material past or present fact." ***McElroy v. Boise Cascade Corp.***, 632 S.W.2d 127, 130 (Tenn. Ct. App. 1982). This means that "statements of opinion or intention are not actionable[,]" nor are "conjecture or representations concerning future events . . . even though they may later prove to be false." ***Id.***

We note, however, that "Tennessee has adopted the *Restatement (Second) of Torts* § 552 as the guiding principle in negligent misrepresentation actions against other professionals and business persons." ***Bethlehem Steel Corp. v. Ernst & Whinney***, 822 S.W.2d 592, 595 (Tenn. 1991); *see also* ***Grogan v. Uggla***, 535 S.W.3d 864, 870 (Tenn. 2017) (reaffirming that Section 552 is applicable in Tennessee). Pursuant to Section 552,

> (1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.
> (2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered
> > (a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and
> > (b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.
> (3) The liability of one who is under a public duty to give the information extends to loss suffered by any of the class of persons for whose benefit the duty is created, in any of the transactions in which it is intended to protect them.

According to comment *b* of Section 552,

> The rule stated in this Section applies not only to information given as to the existence of facts but also to an opinion given upon facts equally well known to both the supplier and the recipient. Such an opinion is often given by one whose only knowledge of the facts is derived from the person who asks it.

The Tennessee Supreme Court has previously held that Section 552 may be used by non-clients to recover against attorneys for "erroneous information" supplied to them "even though the plaintiffs were not clients, because the advice was given for the guidance of the plaintiffs in the course of the [] transaction and reliance upon that advice was justifiable and foreseeable." *Robinson v. Omer*, 952 S.W.2d 423, 427 (Tenn. 1997) (citing *Collins v. Binkley*, 750 S.W.2d 737 (Tenn. 1988); *Stinson v. Brand*, 738 S.W.2d 186 (Tenn. 1987)).

In *Stinson*, the Tennessee Supreme Court held that the alleged failure of a lawyer's assistant to advise non-clients that they should record a deed could be the basis for a claim of negligent misrepresentation if the lawyer "so far undertook to represent the interests of the [non-clients] as to permit a direct action for negligence in doing so or in not more fully advising them." 738 S.W.2d at 187. In *Collins*, the plaintiffs sued the defendant attorney for failing to properly prepare a deed. 738 S.W.2d at 737–38. Citing *Stinson* and Section 552, the *Collins* court likewise held that the non-clients could maintain an action for negligent misrepresentation even in the absence of privity. *Id.* at 739.

This Court more recently applied Section 552, and in particular comment *b*, in *Batten v. Community Trust & Banking Co.*, No. E2017-00279-COA-R3-CV, 2019 WL 4013719 (Tenn. Ct. App. Aug. 26, 2019). In *Batten*, the plaintiff was employed as the CEO and president of a bank. *Id.* at *1. Pursuant to his employment agreement, he was entitled to certain payments upon termination. While under the plaintiff's tenure, the bank was audited by the Tennessee Department of Financial Institutions ("TDFI"), which led to the likelihood that the bank would be declared to be in troubled condition. A bank in a troubled position "is barred from making payments that constitute golden parachutes." *Id.* at *2.

The plaintiff then became concerned about his future with the bank. He consulted with a lawyer employed by the firm that represented the bank and had been involved in the TDFI audit and rating process. According to the plaintiff, "he specifically asked [the attorney] if she was aware of any reason why he might not receive his severance benefits, and she replied that she was not aware of anything that would result in the severance not being paid." Rather, the plaintiff alleged that the attorney advised him to immediately terminate his employment, rather than waiting. *Id.* The plaintiff did resign, the bank was declared to be in troubled condition, and the Federal Deposit Insurance Corporation prohibited the bank from paying any golden parachutes. *Id.* at *3. The bank then refused to pay the plaintiff his severance package.

Relevant to this appeal, the plaintiff thereafter sued the attorney representing the bank for negligent misrepresentation. *Id.* The trial court granted the attorney summary judgment, concluding that any alleged misrepresentations were "about a future event." *Id.* at *6. The trial court further characterized the misrepresentation at issue as the attorney's "failure to warn him that he might lose the Severance Package[.]" *Id.*

On appeal, the plaintiff asserted that the trial court erred and directed this Court to

two alleged misrepresentations: (1) "that he needed to terminate his employment immediately"; and (2) "that [the attorney] was not aware of anything that would affect his ability to receive the severance benefits if he tendered his resignation at that time." *Id.* at *20. Citing Section 552 and comment *b*, we reversed the trial court. As we explained,

> [The plaintiff] asserts that he asked [the attorney] whether there was any legal authority that would affect his ability to receive the severance package. It appears that at the time the parties spoke, [the attorney] was aware of existing facts such as Bank's composite score and TDIF's review of Bank, that, when viewed in the light of her experience with banks in similar situations, made her cognizant of the fact that the plaintiff's severance package was at risk.

*Id.* at *22. We further noted that "a misrepresentation about a future event can be the basis of a negligent misrepresentation claim if the misrepresentation about the future event is based on a present fact." *Id.* (quoting *Int'l Mkt. & Rest., Inc. v. Belmont Univ.*, No. M2010-00005-COA-R3-CV, 2010 WL 4514980, at *3 n.5 (Tenn. Ct. App. Nov. 9, 2010)). We therefore held that the attorney's "alleged statement that she was not aware of anything that would affect [the plaintiff's] ability to receive the severance package appears to be an unsupported conclusion based on the existing facts known to her" that could sustain a claim for negligent misrepresentation. *Id.* at 23.

Westport asserts that the same is true in this case: that given the understanding that Howard Tate would inform Westport of all strategy decisions, Mr. Cherry's recommendation to pursue a motion to dismiss based on lack of duty, and not also or alternatively a motion to dismiss for lack of personal jurisdiction was faulty advice based on the facts as they existed at that time. We agree. Here, the facts surrounding Brands' contact with Tennessee existed at the time that Mr. Cherry recommended that Brands pursue a motion to dismiss based solely on lack of duty. Although Mr. Cherry never made a specific affirmative statement that lack of personal jurisdiction was not a viable defense, the Tennessee Supreme Court has countenanced that silence when advice should have been given can give rise to a claim under Section 552. *See Robinson*, 952 S.W.2d at 427 (citing *Stinson*, 738 S.W.2d at 187); *see also Just. v. Anderson Cnty.*, 955 S.W.2d 613, 616 (Tenn. Ct. App. 1997) ("Nondisclosure of a material fact may also give rise to a claim for fraudulent or negligent misrepresentation when the defendant has a duty to disclose and the matters not disclosed are material."). Moreover, a reasonable reading of Howard Tate's advice, giving all reasonable inferences to Westport, *see Byrd*, 847 S.W.2d at 211, is that Mr. Cherry was stating that lack of duty was the sole defense that should have been raised at that stage of the litigation. As previously discussed, however, that advice may have been faulty, as a reasonable judge would have granted a motion to dismiss based on lack of personal jurisdiction. Accordingly, we must conclude that the trial court erred in granting summary judgment on the basis that Howard Tate negated an essential element of Westport's negligent misrepresentation claim.

## V. Conclusion

The judgment of the Davidson County Circuit Court is affirmed in part, reversed in part, and this cause is remanded for further proceedings consistent with this Opinion. Costs of this appeal are taxed to Appellee, Howard Tate Sowell Wilson Leathers & Johnson, PLLC, for which execution may issue if necessary.

s/ J. Steven Stafford
J. STEVEN STAFFORD, JUDGE
